UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PRAVEEN KHURANA, | Case No. 3:10-cv-00579-BLW |
| Plaintiff, | |
| | MEMORANDUM DECISION AND |
| v. | ORDER |
| NORTH CENTRAL DISTRICT HEALTH DEFENDANTS' DEPARTMENT, CAROL MOEHRLE JOHN DOE MOEHRLE, husband and wife, PAUL GUENTHER, husband and wife, and VITO PALAZZOLO and JANE DOE PALAZZOLO, husband and wife, and ANDY HELKEY and JANE DOE HELKEY, husband and wife, and RENE BARTON and JOHN DOE BARTON, husband and wife | |
| Defendants. | |

**INTRODUCTION**

Plaintiff Praveen Khurana runs a restaurant in Lewiston named The Emperor of

India/King Thai, which he opened in July 2007. In 2008, the North Central District

Health Department suspended Khurana's food license three times for repeated Food Code violations. Khurana maintains that the district health department intentionally interfered with his business and violated his constitutional rights by wrongfully suspending his food license. Defendants seek summary judgment on all Khurana's claims

On March 13, 2012, the Court heard oral argument and took the matter under advisements. For the reasons set forth below, the Court will grant Defendants' summary judgment motion.

## BACKGROUND

Khurana moved from Moscow, Idaho in early 2005, purchased a building on Main Street in Lewiston, Idaho, and began converting it to a restaurant. In the space, Khurana opened a small restaurant called Café Fusion, which he expanded it to a larger restaurant named The Emperor of India/King Thai. The Emperor of India/King of Thai opened on July 13, 2007.

### 1. July 1, 2008 Inspection and July 15, 2008 Suspension

On July 1, 2008, the North Central District Health Department, whose territory encompasses Latah, Clearwater, Nez Perce and Idaho Counties, conducted a routine inspection of Khurana's restaurant. In the report, Health District Inspectors Trevor Anderson and Defendant Vito Palazzolo identified several Food Code violations, but the inspectors allowed the restaurant to remain open. After the inspection Khurana emailed Palazzolo, questioning the violations. Palazzolo explained his view of the violations.

Palazzolo returned with another inspector, Defendant Andy Helkey, on July 15, 2008, to conduct a follow up inspection. Following the July 15 inspection, Palazzolo and Helkey deemed the conditions at Khurana's restaurant an "imminent health hazard" and suspended Khurana's food license.

That same evening, Defendant Paul Guenther, Palazzolo and Helkey's supervisor, noticed that the "Open" sign was lit at Khurana's restaurant. Based on the lit sign, Guenther thought the restaurant looked open for business in violation of the suspension notice; Guenther therefore asked the Lewiston Police Department to send an officer to check whether Khurana was serving food at his restaurant. The officer did not see any evidence of food being served – just beer and wine.

A couple of days later – after exchanging several emails with Palazzolo about the violations – Khurana requested both an appeal of the suspension and a compliance conference. Guenther scheduled a conference with Khurana for July 24, 2008. He also forwarded Khurana's appeal of the suspension to Patrick Guzzle who is the Food Protection Program Manager for the Department of Health and Welfare. Apparently, neither the Health Department nor the Health District processed the appeal, but Guenther conducted a compliance conference with Khurana on July 24.

Defendants claim that the conference lasted over two hours, and that Khurana's perspective concerning the violations was discussed at length. By contrast, Khurana claims that Guenther ignored his concerns about the reported violations and refused to review a black binder full of photographs and other items, which Khurana had prepared.

According to Khurana, Guenther presented Khurana with a compliance agreement and told him to sign it or else his license would be revoked.

It is undisputed, however, that Khurana entered into a compliance agreement. He agreed to correct the violations, comply with the Food Code, and to work cooperatively with the health inspectors. He also consented to random, unannounced enforcement inspections. Pursuant to IDAPA 16.02.19.861.01(b), the Compliance Agreement constituted an enforceable Consent Order.

After the compliance conference, on July 28, 2008, Palazzolo and Helkey re-inspected Khurana's restaurant. While Palazzolo and Helkey documented Food Code violations in the inspection report, they no longer believed that the restaurant conditions constituted an imminent health hazard. They therefore lifted the suspension.

## 2. September 5, 2008 Inspection and Suspension

A month passed, and Palazzolo and Helkey returned to the restaurant on September 5, 2008, at approximately 2:20 pm to conduct an unannounced inspection pursuant to the Compliance Agreement. Defendants assert that the "Open sign was illuminated, the door was unlocked, and workers were preparing food in the kitchen." *Defy.' SUF* ¶ 16, Dkt. 30-2. The inspectors believed that they had the right to continue the inspection because Khurana had consented to unannounced inspections in the Compliance Agreement.

Khurana, however, disagrees with Defendants' version of events. He claims that he had inadvertently left the "Open" light illuminated, but the hours posted on the door

clearly indicated that the restaurant was closed. Khurana asked the inspectors to leave and return when the restaurant re-opened. The inspectors ignored Khurana's request. Khurana says he felt threatened by the inspectors' hostility, and he, as well as all others who were preparing food, left. Upon leaving Khurana called Guenther to complain, but Guenther allowed the inspection to continue.

Palazzolo and Helkey finished the inspection, and concluded that the conditions at the restaurant constituted an imminent health hazard. They issued a second Notice of Summary Suspension. Five days later, on September 10, 2008, Palazzolo and Helkey conducted a follow-up inspection and found that the conditions had improved enough to justify lifting the suspension. Khurana was allowed to re-open the restaurant.

Between the suspension on September 5 and the re-inspection on September 10, a reporter from the Lewiston Tribune submitted a public records request for the suspension notices and inspection reports regarding Khurana's restaurant. The Health District provided the requested copies. The reporter also asked Guenther questions about the suspension, which, Guenther says, he answered truthfully. News of the suspension and Guenther's comments were included in a story published on September 9, 2008.

On September 11, 2008, the same Tribune reporter again contacted Guenther, who confirmed that the restaurant had been allowed to re-open. Guenther told the reporter that it was Khurana's responsibility to maintain standards. The reporter's story, which included Guenther's quotes, was published the next day, after the suspension had been lifted.

### 3. November 7, 2008 Inspection and Suspension and November 13, 2008 Revocation

After a reprieve of two months, on November 7, 2008, Palazzolo and Helkey conducted another unannounced inspection pursuant to the Compliance Agreement and concluded a third time that the conditions at Khurana's restaurant constituted an imminent health hazard. They issued a third Notice of Summary Suspension. They followed up this inspection on November 13, 2008. After this re-inspection, they did not lift the suspension, concluding that ongoing Food Code violations continued to create an imminent health hazard. Another five days later, the Health District staff conducted a third re-inspection and found the conditions at Khurana's restaurant still did not pass muster. He was not allowed to re-open. Instead, the Health District issued a Notice of Intent to Revoke Khurana's food license.

On November 20, 2008, Khurana went to the Health District offices and attempted to drop off a 2009 license renewal application with Rene Barton, a Health District administrative assistant. Barton refused to accept the application because she did not believe she could accept his application given the suspension of Khurana's food license and the notice of intent to revoke. She told Khurana to return the next day to talk to Guenther. This frustrated Khurana, and he became argumentative. He returned twice more that same day and attempted to videotape Barton, as well as Health District clients sitting in the waiting room.

Barton says she felt threatened and reported what happened to the Health District director, Carol Moerhle. Moerhle also learned that Khurana apparently filmed not only Health District personnel but also their clients, including clients seeking medical treatment. She then contacted the Lewiston Police Department, who escorted Khurana off the premises and charged him with disturbing the peace. In conjunction with the police visit, Moerhle signed a Uniform Notice of Trespass, which prevented Khurana from entering Health District premises.

Thwarted in his attempt to renew his food license, Khurana appealed to the Idaho Department of Health and Welfare both the November 7, 2008 suspension and the November 13, 2008 notice of intent to revoke. After a hearing was held in February 2009, a Department hearing officers issued a decision finding the appeals moot because Khurana's food license had expired at the end of 2008. Khurana therefore applied for a 2009 food license, which required that a pre-opening inspection be conducted.

**4. April 7, 2009 Pre-opening Inspection and May 13, 2009 Re-inspection**

Palazzolo and another NCDHD inspector conducted the pre-opening inspection on April 7, 2009. They found several Food Code violations and determined that Khurana should not be issued a license. Khurana appealed this decision and requested a re-inspection. The Department granted the request and determined that one of its inspectors, rather than the Health District's, would conduct the inspection.

On May 13, 2009, a Department inspector conducted the re-inspection and noted a few Food Code violations. But Khurana either corrected them, or promised to correct

them within a certain time, so the Department issued him a food license and allowed him to re-open.  Khurana has remained open since that time.

### 5.  Khurana's Complaint

Defendants maintain that none of their actions related to Khurana and his restaurant were undertaken with ill will, with an improper objective or purpose, or with intent to injure him or cause him any emotional distress.  Instead, Defendants say they were just doing their jobs.  Palazzolo and Helkey testify that they actually observed the conditions recorded in their inspection reports and depicted in the photos, and in their professional judgment, they believe those conditions were Food Code violations.

Khurana vehemently disputes Defendants' rendition of the conditions at his restaurant and asserts that the Health District inspectors did not find many "true" violations.  For example, Palazzolo and Helkey reported that food was stored below chemicals, but Khurana says this is not true.  The inspectors also cited Khurana for his food items in the cooler being above approve temperatures; Khurana, however, asserts that the inspectors did not test the foods for temperature in accordance with the Food Code, which allows for a cooling period after preparation and reheating of up to six hours.  According to Khurana, the inspectors "ignored these requirements and manipulated the thermometers and ignored other requirements by taking the food out of the coolers in the heat of summer and not considering how long it had been since was prepared or reheated. Foods were out in a kitchen where temperatures exceeded 90 degrees."  *Pl's SUF* at 3, Dkt. 59-1.

Khurana also disputes almost every other Food Code violation found by the inspectors. Khurana claims that Defendant Palazzolo and Helkey's findings reported in their inspection reports "were dishonest and inconsistent with the food code and previous NCDHD inspectors." *Pl's SUF* at 6, Dkt. 59-1. He says that it is untrue that his shelving units were not properly constructed, that food items were not properly labeled, that items in the freezer were not properly date marked, or that the spoiled food items found in the cooler were a health hazard. He finds further fault in the inspectors' findings that there was a "mice infestation" or that there was a "bug infestation." *Id.* at 27.

Khurana asserts that the Health District inspectors cited him for all these "invented" violations and ordered an immediate suspension of his license rather than giving him the time allowed under the Food Code to correct them "[o]ut of spite, anger and discrimination." *Pl.'s SUF* at 4, Dkt. 59-1. Seeking a remedy for these alleged transgressions, Khurana filed an Amended Complaint on December 2, 2010, listing 12 causes of action. His claims include: (1) tortious interference with economic expectancy; (2) discrimination based on race; (3) violation of due process and 42 U.S.C. § 1983; (4) conspiracy; (5) deprivation of civil rights by Carol Moerhle; (6) negligent training of inspectors; (7) intentional and/or negligent infliction of emotional distress; (8) breach of duty of good faith; (9) slander/libel; (10) negligent hiring or retaining; (11) interference with plaintiff right to full benefit of laws and proceedings in violation of 42 U.S.C. 1981; and (12) tortious interference with business relations.

## LEGAL STANDARD

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the issue on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir.2002); *see also* Fed.R.Civ.P. 56(e). In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v.*

*Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003).  If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay.  *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

Statements in a brief, unsupported by the record, cannot be used to create an issue of fact.  *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).  The Circuit "has repeatedly held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment."  *Beyene v. Coleman Sec. Services, Inc.,* 854 F.2d 1179, 1182 (9th Cir.1988).  Authentication, required by Federal Rule of Evidence 901(a), is not satisfied simply by attaching a document to an affidavit.  *Id.*  The affidavit must contain testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document.  *Id.*

## ANALYSIS

Khurana concedes that sufficient evidence does not exist to sustain his Second Cause of Action, *Discrimination Based on Race*; his Sixth Cause of Action, *Negligent Training of Inspectors*; and his Tenth Cause of Action, *Negligent Hiring or Retaining*.  For the remaining claims, Khurana argues that numerous issues of material fact exist on the remaining claims, and therefore summary judgment in favor of Defendants is not appropriate.

**1. Intentional Interference Claims**

Khurana asserts claims for intentional interference with economic expectancy and business relations. *Pl.'s Opp'n* at 10, Dkt. 59. To establish both these claims, Khurana must show that "the interference was wrongful by some measure beyond the fact of the interference itself." *Wesco Autobody Supply, Inc. v. Ernest*, 243 P.3d 1069, 1081 (Idaho 2010).

**A. *Wrongfulness***

Proof that the alleged interference was wrongful requires evidence that "the defendant had a duty of non-interference; *i.e.,* that he interfered for an improper purpose [to harm the plaintiff] or used improper means." *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.,* 824 P.2d 841, 860 (Idaho 1991) (internal quotation marks omitted). "Wrongful means" includes "conduct in violation of a statute or other regulation, or a recognized rule of common law, such as violence, threats of other intimidation, deceit or misrepresentation, bribery...or disparaging falsehood." *Bliss*, 824 P.2d at 861 (internal quotation marks omitted).

Khurana insists that record contains numerous examples that indicate Defendants acted wrongfully or with malice: (1) Guenther forced Khurana to sign the Compliance Agreement; (2) the inspectors falsely noted that the restaurant was infested with mice and insects, and Guenther relayed this information to a reporter; (3) the inspectors conducted unannounced inspections outside the restaurant's operating hours and refused to leave when Khurana told them the restaurant was closed; (4) Guenther told the police to check

the restaurant every night for several weeks to ensure Khurana was not selling food when his license was suspended; and (5) the inspectors invented violations. Khurana claims that Barton also acted wrongfully by Barton refusing his renewal application and making false statements to the police regarding her personal safety.

Here, Palazzolo, Helkey, Guenther, and Barton all testified that they did not act with an objective or purpose to harm Khurana but instead were simply doing their jobs. And nothing in the record contradicts or sheds any real doubt on their testimony. For example, Khurana presents no evidence that Defendants disliked Khurana personally, or that they sought to bolster another's restaurant business at the expense of Khurana's, or that they shut down Khurana's restaurant with a racially-discriminatory purpose. If Khurana had presented evidence of this sort, it could give rise to the inference that Defendants acted with the purpose of harming Khurana. But he did not.

Nor does the evidence show that Defendants used improper means. Defendants did nothing illegal, and there is no evidence that they threatened Khurana or intimidated him.

With respect to Khurana's complaints against Rene Barton regarding her refusal to accept Khurana's renewal application and her reporting of her fears to her supervisor, Khurana cannot show that either action was wrongful. Barton testified that she did not think that she could accept Khurana's renewal application when his license was suspended, and therefore she told him to return the next day to talk to Guenther, who could make that decision. Even if her basis for refusing the application was wrong, it was

not illegal, and there exists nothing in the record that Barton sought to intimidate Khurana or purposely thwart him by refusing his application.  And Barton did not act wrongfully by telling her supervisor that she felt threatened by Khurana after he became frustrated and argumentative and began videotaping her and Health District client – there is no evidence that she lied about how the situation made her feel in order to harm Khurana.

Khurana also complains that Guenther acted wrongfully by asking a police officer to stop by Khurana's restaurant to ensure that Khurana was not serving food after his license was suspended; but there is nothing inherently wrongful about a health inspector asking a police officer to make sure a restaurant owner obeys the law.  And while Guenther admittedly made an incorrect statement to a reporter about the effect of a license revocation, Khurana does not present any evidence to suggest that Guenther knew the statement was wrong when he said it.  The lack of proof that Guenther knew the information he provided the reporter was false limits the probative value of this incident.

Finally, Khurana alleges that Guenther acted wrongfully by coming into the compliance conference with a pre-written order, refusing to listen to Khurana's concerns, and then telling Khurana to sign it or his license would be revoked.  But the excerpts from compliance conference transcript submitted by Khurana do not support Khurana's version of events.  At one point during the conference, Khurana asks whether he could explain the circumstances of an alleged violation, and Guenther answered "absolutely." *Compliance Conference Tr.* 57:10-12.  Guenther then allowed Khurana to explain why

the temperature of food stored in a cooler was significantly above the required 41 degrees. In fact, the compliance conference lasted two and a half hours. *Guenther Aff.* ¶ 7, Dkt. 30-5. This belies Khurana's suggestion that Guenther simply intended to railroad him into signing the Compliance Agreement, and it does not support an inference that Guenther acted wrongfully.

This leaves Khurana's complaints against the Palazzolo and Helkey, who conducted the investigations that led to the suspension of Khurana's license. Khurana suggests that Palazzolo and Helkey invented food code violations to shut down his restaurant. Specifically, Khurana alleges that Palazzolo and Helkey intentionally interfered with his economic expectancy and "said interference was wrongful, intentional, and malicious in that the inspectors' claims in inspection reports were knowingly false, or reasonably should have been known to be false and were made with malice or gross negligence." *Am. Compl.* ¶ 5.3, Dkt. 5. The Court agrees that it could be wrongful for a health inspector to invent food code violations so he could shut down a restaurant. Khurana's allegations, however, rest on a shaky factual foundation.

As proof that Palazzolo and Helkey invented violations, Khurana relies heavily on the deposition testimony of Patrick Guzzle, the Food Protection Program Manager for the Department of Health and Welfare. Khurana contends that "Guzzle's deposition describes in great detail the reasons why nearly every violation alleged by [the Health District] did not justify revocation of the establishment's license. His findings and deposition repudiates the conduct by the [Health District] and constitutes an absolute

admission which is binding upon the Defendants that this case is not appropriate for any summary judgment." *Pl's Opp'n* at 2, Dkt. 59. This is a gross overstatement of Guzzle's testimony. The Court has reviewed Guzzle's deposition, and at no point does he say that the Health District was not justified in suspending Khurana's food license, or that the inspectors were wrong in finding a specific violation.

Rather, in response to hypotheticals presented by Khurana's counsel, Guzzle stated that he might have asked more questions before finding a violation; or, Guzzle even stated in response to some hypothetical that he might not have found a violation under similar circumstances. But this is not close to Guzzle saying that the Health District inspectors were unjustified in their actions or that they acted with the intent of harming Khurana. In fact, Guzzle repeatedly testified that he could not opine about the propriety of Palazzolo and Helkey's findings because he was not present during inspections, and he did not personally witness the conditions as they existed in Khurana's restaurant. Guzzle did not enter Khurana's restaurant until ten months after the first suspension, eight months after the second, six months after the third, and five weeks after the April 7, 2009 pre-inspection opening.

Moreover, Guzzle testified that nothing in the inspectors' reports caused him concern about the legitimacy of the reports, and he had no reason to believe Palazzolo and Helkey were biased. *Guzzle Dep.* 33; 98. Nor did it surprise Guzzle that Khurana had corrected the violations that the Health District inspectors observed by the time Guzzle conducted his inspection. *Id.* at 137:138:1. Guzzle also recognized that

restaurant owners sometimes present legitimate complaints about a decision to suspend or revoke a license, but a health inspector must ultimately err on the side of public health even if the decision affects a person's lifestyle or even his or her livelihood. *Id.* at 133:9-134:15. In sum, the Court could find nothing in Guzzle's testimony from which a juror could infer that Palazzolo and Helkey had no justification for their findings or that they acted wrongfully.

Khurana has no evidence to dispute that Palazzolo and Helkey concluded – based solely on their professional judgment – that the conditions at Khurana's restaurant presented an "imminent health hazard" and decided to suspend Khurana's license in the interest of public safety. Indeed, Khurana concedes that the some of the inspection photographs are "facially shocking" and "do indeed prejudice the mind of the observer." *Pl's Opp'n* at 17, Dkt. 59. He even attempts to explain away what is depicted in the photographs. The fact that Khurana must explain conditions documented by the inspectors, which he admits are "facially shocking," undermines his argument that the inspectors were not simply exercising their judgment when they found violations but instead invented them to harm Khurana. The inspectors did not create the "facially shocking" conditions at Khurana's restaurant; they merely observed them, documented them, and concluded that they created an "imminent health hazard."

Health inspectors must exercise their judgment to protect the safety and health of the public. At most, Khurana raises issues of fact regarding the soundness of Palazzolo and Helkey's judgment, but he offers no evidence that they did not use their judgment or

that they did not believe they were acting in the interest of public health and safety. If Khurana had introduced evidence that Palazzolo and Helkey closed the restaurant because of reasons other than the exercise of their judgment, such as to harm Khurana, a triable issue on wrongfulness might exist. But Khurana introduces no such evidence, and instead merely contests whether there was an actual hazard. Even if the evidence shows that Defendants were particularly zealous in enforcing the Food Code, this is not enough to create a material issue on whether Palazzolo and Helkey acted wrongfully.

### B. *Immunity*

Assuming Khurana could create an issue of fact regarding whether Defendants' alleged interference was "wrongful," government employees are immune from liability for the intentional interference claim unless they act with malice or criminal intent. The Idaho Tort Claims Act protects governmental employees from liability for any claims arising out "interference with contract rights" unless they act with malice or criminal intent. I.C. §§ 6-904(3). "Malice" means "actual malice," which requires a wrongful act without justification combined with ill will. *Anderson v. City of Pocatello*, 731 P.2d 171, 183 (1987).

First, Palazzolo, Helkey, Guenther, and Barton all submitted affidavits stating that they did not act with ill will, and as described above, Khurana did not submit sufficient evidence to contradict that testimony. Second, also as discussed above, when Khurana himself admits that the documented conditions were "facially shocking," the Court cannot find the inspectors acted with malice in finding an imminent health hazard. Nor

does the evidence support the conclusion that either Guenther or Barton acted with malice.

Khurana responds that the Idaho Tort Claims Act immunity does not extend to claims for intentional interference with economic expectancy and interference with business relations. Section 6-904(3) only specifies claims arising out of "interference with contract rights." It does not mention claims for interference with economic expectancy or business relations, and Idaho courts have not expressly found that the Section 6-904(3) encompasses such claims.

But federal courts construing similar provisions of the Federal Tort Claims Act have found that the grant of immunity for interference with contract rights claims applies to claims for interference with prospective economic advantage. *See, e.g.*, *Art Metal-U.S.A., Inc. v. U.S.*, 753 F.2d 1151, 1155 (D.C. 1985). "To hold that interference with prospective advantage does not arise out of interference with contract rights…would subject the government to liability if its employees interfered with the plaintiff's mere expectation of entering a contract, but not if they interfered with a contract already in existence. Such a result would be illogical and contrary to the words and reason of the exception." *Id.* (internal quotations marks omitted). The Court agrees that the grant of immunity should encompass other intentional interference claims. More importantly, this view coincides with the Idaho courts' interpretation that interference with contract and interference with economic expectancy are "nearly identical" torts. *Highland Enterprises, Inc. v. Barker*, 986 P.2d 996, 1004 (Idaho 1999).

This Court therefore holds, "as has nearly every court that has addressed this issue," that the Idaho Tort Claims Act immunity for intentional interference with contract extends to Khurana's claims for intentional interference with economic expectancy and business relations. *Art Metal U.S.A.*, 753 F.3d at 1155 (collecting cases).

## 2. Section 1983 Claims

To sustain an action under 42 U.S.C. § 1983, Khurana must show both: (i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States. *West v. Atkins,* 487 U.S. 42, 48 (1988); *Wood v. Ostrander,* 879 F.2d 583, 587 (9th Cir. 1989).

Khurana easily meets the first prong. Because Guenther and his team of inspectors and administrative assistants acted as Health District employees enforcing the state food code, they were, in their official capacities, acting under the color of state law.

Khurana faces a greater challenge in demonstrating with relevant facts that Defendants' actions deprived him of his constitutionally protected rights to unreasonable search and seizure and to due process. The standards vary for each claim and will be addressed separately

### A. *Fourth Amendment*

Khurana alleges that Palazzolo and Helkey violated his due process rights by entering his restaurant without a warrant on September 5, 2008 after Khurana had refused access. The Fourth Amendment of the United States Constitution, which was

incorporated against the states by the Fourteenth Amendment's Due Process Clause, protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U .S. Const. amend. IV. Khurana, however, has not provided sufficient evidence that Palazzolo and Helkey conducted an unreasonable search on September 5.  Even if he did, Palazzolo and Helkey are entitled to qualified immunity.

First, the health inspectors did not require a warrant to conduct the search on September 5, 2008 because Khurana consented to the search.  As a condition of obtaining a restaurant license, Khurana agreed to allow health inspectors' access to his restaurant. Food Code §§ 8-302.13(C), 8-302.14(g) (2), 8-304.11 (B), 8-304.11(F), and 8-402.11. Khurana also consented to unannounced inspections as a condition of the Compliance Agreement, and the Food Code specifically authorizes regulatory authorities to impose requirements in addition to those specifically included in the Food Code.  *Id.* at § 8-102.10(A).  A consensual search does not require a warrant.  *Morgan v. United States*, 323 F.3d 776, 781 (9th Cir. 2003).

Moreover, in closely regulated industries warrantless inspections are permitted if the inspection is made pursuant to a regulatory scheme designed to protect the health and welfare of the people, and the regulatory scheme provides a "constitutionally adequate substitute for a warrant."  *See, e.g., New York v. Burger*, 482 U.S. 691 (1987).  The Court finds that the inspection conducted on September 5, 2008 falls within the established

exception to the warrant requirement for administrative inspections in a "closely regulated" business.

The food industry is a closely regulated business, and the state has a substantial interest in regulating food safety. *Contreras v. City of Chicago*, 119 F.3d 1286, 1290 (7th Cir. 1997). In addition, as with the inspections of automobile junkyards in *Burger*, requiring health inspectors to obtain a warrant or provide notice to owners prior to conducting a health or safety inspection could frustrate enforcement of the food safety ordinances; therefore, warrantless inspections are necessary to further the regulatory scheme. *Burger*, 482 U.S. at 710. Finally, the Food Code provisions provide a "constitutionally adequate substitute for a warrant." The Food Code informs license holders that inspections will be made on a regular basis and the Code limits the "time, place, and scope" of the inspections. *Id.* at 711. Because warrantless inspections in the food industry further a regulatory scheme designed to ensure food safety, the warrantless inspection on September 5, 2008 was therefore reasonable even without Khurana's consent.

Khurana argues that he revoked his consent when he told the inspectors to leave, and therefore the inspectors should have obtained a warrant before continuing the inspection. Under the Food Code, if a person denies access, the inspector must tell the person that the permit hold is required to allow access, and access is a condition of acceptance and retention of a restaurant license. IDAPA § 8-402.20. The inspectors must make a final request for access. *Id.* If the person in charge continues to refuse

access, the Food Code allows the inspector to apply for the issuance of an inspection order to gain access. *Id.* at § 8-402.40. Nothing requires an inspector to obtain a court order if the license holder refuses access. In fact, the inspectors could have revoked Khurana's license once he refused to allow them to inspect the restaurant, and it would not have been necessary for the inspectors to seek an inspection order *as permitted* in Section 8-402.40 before proceeding with the revocation. IDAPA 16.02.09.860.01(b).

Assuming, however, that Khurana's demand that the inspectors leave the premises made the September 5, 2008 inspection unreasonable, Palazzolo and Helkey are nonetheless entitled to qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Once a defendant raises the qualified immunity defense, the plaintiff must come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that the law was clearly established when the alleged violation occurred. *Alston v. Read*, 663 F.3d 1094, 1098-99 (9th Cir. 2011).

Here, Khurana cites only *See v. Seattle*, 387 U.S. 541 (1967) in support of his claim that the inspection conducted on September 5, 2008 violated his constitutional rights because the inspectors did not obtain a warrant before proceeding. In *See*, the Supreme Court held that the Fourth Amendment's warrant requirement applies to

commercial premises as private homes. The Court in *Burger*, however, distinguished *See*, holding that a warrant is not necessarily required for inspections of premises in a closely regulated industry. *Burger*, as well as the already discussed Compliance Agreement/consent issues, suggests that the inspectors' actions complied with rather than violated the law. Because Khurana provides no authority clearly establishing that a warrant or order was required under the facts of this case, the Court finds that Palazzolo and Helkey are entitled to qualified immunity on this issue.

### B. *Due Process*

In his Amended Complaint, Khurana specifically directed his § 1983 claim at the September 5, 2008 inspection, but he now claims that this claim encompasses all the alleged transgressions perpetrated by Palazzolo and Helkey. Khurana, however, fails to list the legal authority and elements supporting his additional § 1983 claims. Khurana's failure to specify which constitutional right Palazzolo and Helkey violated and how by their alleged "multitude of transgressions" is fatal to this claim. But even if the Court assumes that Khurana intended to argue that Palazzolo and Helkey violated his due process by suspending his restaurant license based on allegedly invented violations, the claim still fails.

The Due Process Clause of the Fourteenth Amendment provides, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. At the core of the due process clause is the right to notice and a hearing at a meaningful time and in a meaningful manner. *Armstrong v. Manzo,* 380 U.S.

545, 552 (1965). Ordinarily, due process of law requires an opportunity for some kind of hearing prior to the deprivation of a significant property interest. *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 19 (1978). Khurana was given the requisite notice and opportunity to be heard with each suspension and with the notice of intent to revoke. *Moerhle Aff.*, Exs. 5, 7, 8, 15, 25 and 29. Khurana cannot and does not allege otherwise.

Any barely articulated claim for a substantive due process claim similarly fails. The Constitution's substantive due process guarantee protects an individual from arbitrary government action. *See Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 845–46 (1998). Substantive due process is violated by "executive abuse of power ... which shocks the conscience." *Id.* at 846. "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* (internal quotation marks omitted).

The facts of this case do not shock the conscience. Viewed in the light most favorable to Khurana, the record before the Court demonstrates that Palazzolo and Helkey conducted various inspections, observed conditions that Khurana admits were "facially shocking," and decided to suspend Khurana's restaurant license out of concern for public safety. Guenther supported the health inspectors' decisions.

Although Khurana disagrees with Palazzolo and Helkey's findings, "the Due Process Clause is not a guarantee against incorrect or ill-advised [government] decisions." *Uhlrig v. Harder,* 64 F.3d 567, 573 (10th Cir. 1995) (quoting *Collins v. City of Harker Heights Tex.,* 503 U.S. 115, 129 (1992). Indeed, to satisfy the "shock the conscience" standard, a plaintiff must even "do more than show that the government

actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Id.* The Court cannot characterize any Defendant's actions as "the most egregious official conduct." Thus, Khurana has failed to meet the high standard that the Supreme Court has set for substantive due process claims.

## C. *Deprivation of Civil Rights by Carol Moerhle*

Khurana alleges that Carol Moerhle also deprived him of his constitutional rights by sanctioning the other Defendants' conduct and causing the Uniform Notice of Trespass to be issued. *Am. Compl.* ¶¶ 7.3, 9.1-9.5, Dkt, 5. The Notice of Trespass allowed Khurana to enter the Health District premises only if he first provided notice.

In their summary judgment brief, Defendants point out that there is no constitutional right to access to public property, *United States Postal Service v. Greenburgh*, 453 U.S. 114, 129 (1981), and no clear case law establishing a clear "process" that must be granted to an individual before a Notice of Trespass issues. *Defy.' Opening Br.* at 18. Dkt. 30-1. Also, Defendants note that Khurana never alleged that the Notice was issued because he was a member of a suspect class, and Khurana failed to prove that he had been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Therefore, according to Defendants, both Khurana's due process and equal protection claims against Moerhle fail.

The Court agrees. Khurana has not submitted any factual or legal basis for his claim that he was deprived any process due, and he has not proved his "class of one"

equal protection claim. In fact, in his brief, all Khurana states in support of his constitutional claim against Moerhle is: "Covered within the argument re the First/Twelfth, Third and Fourth Cases of Action." *Pl.'s Opp'n* at 18, Dkt. 59. This is not enough to survive summary judgment on these claims – especially given that the Court has found Khurana's other claims should be dismissed.

### D. *Municipal Liability*

The question of municipal liability is implicated by Buchanan's first three claims. In *Monell v. Department of Social Services,* 436 U.S. 658, 690 (1978), the Supreme Court held that a municipality can be sued as a "person" under section 1983 if "the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury ..." *Id.* at 694. However, a city or county may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior. Monell,* 436 U.S. at 691.

The plaintiff must satisfy four elements to establish municipal liability for a failure to protect an individual's constitutional rights: (1) the plaintiff possessed a constitutional right, of which he was deprived; (2) the municipality had a policy; (3) this municipal policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) the municipal policy is a moving force behind the constitutional violation. *Oviatt v. Pearce,* 954 F.2d 1470, 1474 (9th Cir. 1992). A municipality is not liable under section 1983 for acts of negligence by one of its employees or for the occurrence of an unconstitutional act by the non-policymaking employee. *Davis v. City of Ellensburg,* 869 F.2d 1230, 1234–5

(9th Cir. 1989). Evidence of mistakes made by adequately trained employees or a single unconstitutional action by a non-policymaking employee is not sufficient to show the existence of a custom or policy that violates constitutional rights. *Id.*

Khurana's argument stumbles on the first prong. Khurana has not shown that he was deprived of a constitutional right. *Collins v. City of Harker Heights,* 503 U.S. 115, 120 (1992). Thus, his municipal liability claim against the Health District must be dismissed.

### 3. Conspiracy Claim

In the Amended Complaint, Khurana alleged that Defendants conspired to deprive him of his rights based on his race in violation of 42 U.S.C §§ 1983 and 1985. Khurana now concedes that the evidence does not support a race discrimination claim. *Pl's Opp'n* at 1. This concession would seem to dispense with Khurana's conspiracy claim, but he now asserts that the conspiracy cause of action encompasses all of the alleged constitutional violations. Regardless, Khurana's conspiracy claim fails because his § 1983 claims fail. In addition, a plaintiff must meet strict pleading requirements to state a civil conspiracy claim, and mere conclusory allegations of a conspiracy do not suffice. *Woodrum v. Woodward County*, 866 F.2d 1121, 1126 (9th Cir. 1989). Khurana has not met these strict pleading requirements, and therefore his conspiracy claim will be dismissed.

### 4.  Intentional and/or Negligent Infliction of Emotional Distress

Because Khurana's emotional distress claims arise out of licensing and inspection related activities, Idaho Code §§ 6-904B(3) and (4) protects them from liability unless Khurana can show that they acted with malice or criminal intent or with gross negligence or engaged in reckless, willful and wanton conduct.   Khurana has failed to make this showing; therefore, this claim will be dismissed.

### 5.  Breach of Duty of Good Faith

Defendants are entitled to summary judgment on Khurana's breach of the duty of good faith and fair dealing because none of the Defendants and Khurana had a contractual relationship.  "Only a party to a contract may assert a claim for breach of the covenant of good faith and fair dealing." *Noak v. Idaho Dept. of Correction*, – P.3d –, 2012 WL 29343, *3 (Idaho January 6, 2012) (citing *Tolley v. THI Co.*, 92 P.3d 503, 511 (2004)).

Khurana responds that a contract did exist between him and the Health District: "Mr. Khurana made an application (an offer) and NCDHD responded with a written permit/license which constituted a contract granting him the right to do business, which contract incorporated Idaho Food Code compliance as a condition of continuing to do business." *Pl's Opp'n* at 19, Dkt. 59.  But Khurana offers no legal support for his position.

By contrast, other courts have said that an agency's performance of its regulatory or sovereign functions does not create contractual obligations without something more.

*Cain v. U.S.*, 350 F.3d 1309, 1315 (Fed. Cir. 2003) (citing *D & N Bank v. United States,*

331 F.3d 1374, 1378-79 (Fed. Cir. 2003)).  Here, there is nothing more than the Health

District's performance of its regulatory function.  Thus, there was no contract between

Khurana and Defendants and his duty of good faith and fair dealing claim must be

dismissed.

### 6.  Slander/Libel

Under Idaho Code § 6-904(3), governmental entities and their employees are immune

from slander and libel claims so long as they act without "malice" or criminal intent.  As

discussed above, Khurana has failed to establish that any Defendant acted wrongfully or

with ill will.  Therefore, this claim must also be dismissed.

### 7.  Violations of 42 U.S.C. § 1981

Section 1981 prohibits racially motivated denials of equal protection and the full

benefit of the law.  Khurana concedes that there is no evidence that defendants' actions

were racially motivated.  *Pl's Opp'n* at 1, Dkt. 59.  But Khurana complains that

"[c]ounsel again tries to limit this claim to racial discrimination and such is not a fair

reading of the allegations of the Complaint under paragraphs 15.1 through 15.4." *Id.* at

20.  Khurana states that he has properly pleaded and documented "questions of fact and

issues…in the affidavits and depositions for submission to the jury." *Id.*  In his brief,

Khurana did not explain how Section 1981 encompasses equal protection claims other

than those motivated by racial animus.

But at oral argument, Khurana's counsel expounded further on his argument that Khurana's Section 1981 claim should not be limited to racial discrimination claims. He explained that Section 1981 never mentions race but instead guarantees that all persons enjoy the same rights as those enjoyed by "white citizens," and "Mr. Khurana has a very nice sun tan." *Draft Hearing Tr.* Seeking clarification, the Court asked Khurana's counsel whether he believed a showing of racial animus was needed to prove a Section 1981 claim, and Khurana's counsel pointed out that the Court used the word, "race" while he used the word, "color." By making this distinction, counsel seemed to suggest that all Khurana needed to prove for his Section 1981 claim was that Khurana's skin color was something other than white and that he had been treated differently. Khurana's counsel acknowledged, however, that this was a novel argument, and he had not found any authority to support it. Given the novelty of this argument and the lack of authority to support it, the Court will also dismiss this claim.

## ORDER

**IT IS ORDERED that** Defendants' Motion for Summary Judgment (Dkt. 30) is **GRANTED**.

DATED: April 16, 2012

B. Lynn Winmill
Chief Judge
United States District Court